## Appeals of THERESA ZELLERBACH and ISADORE ZELLERBACH.

Docket Nos. 883, 2028.   Submitted June 24, 1925.   Decided October 28, 1925.

Stock issued from the treasury of a corporation to its stockholders in proportion to their previous holdings, for surplus capitalized and without any distribution of profits, is a stock dividend and is not income under section 2(a) of the Revenue Act of 1916, as amended by section 1200(a) of the Revenue Act of 1917, and section 201 of the Revenue Act of 1918.

*John Francis Neylan* and *Frank D. Madison, Esqs.*, for the taxpayers.

*Ward Loveless* and *A. Calder Mackay, Esqs.*, for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

income tax for the years 1917 and 1918, and the appeal of Isadore Zellerbach involves a deficiency in like tax in the amount of $25,159.16 for the years 1917 and 1918. The issue involved is the same in both appeals and the deficiencies respectively rest upon the determination of the question as to whether a dividend declared by the Zellerbach Paper Co. in 1917 was a cash or a stock dividend.

### FINDINGS OF FACT.

1. The taxpayer, Isadore Zellerbach, appears as an individual in his own appeal and as executor of the estate of Theresa Zellerbach, who died during the month of September, 1921. During the period involved Theresa Zellerbach was a very elderly woman and the largest individual stockholder in the Zellerbach Paper Co. Isadore Zellerbach was her eldest son, was the next largest stockholder, was president of the company, and acted as agent for and managed all of his mother's interests and business affairs.

2. The Zellerbach Paper Co., hereinafter referred to as the company, is and at all the times herein mentioned was a corporation organized under the laws of California, with its principal place of business in San Francisco. It has been engaged in the business of manufacturing and wholesaling paper from 1907 to and including the present year. In 1916 and 1917 its authorized capital stock was $3,000,000, divided into 30,000 shares of the par value of $100 each. On June 1, 1916, the company had issued and outstanding $1,500,000, or 15,000 shares, of its capital stock. It had accumulated over a period of years since 1907 a large surplus, and had declared only small dividends for the years from 1907 to 1916. It was desired to capitalize a large part of this surplus, and on June 12, 1916, the directors, at a meeting thereof, passed a resolution declaring that it was for the best interests of all the stockholders of the company that the " corporation retain all of its accrued surplus and undivided profits (except such amount as may be necessary to keep up the payment of annual or monthly dividends) in the business of the corporation." By the same resolution a dividend was authorized of " one share of new stock as a stock dividend for two shares of the stock outstanding." Under this resolution capital stock of $750,000, or 7,500 shares, was issued to the stockholders and " Capital stock " was credited and " Surplus " debited with the said amount of $750,000. This stock dividend aroused considerable discussion among customers of the company and in financial circles, and newspaper articles commented on the " cutting of a melon " by the company. The gist of such discussion and comment was that the company was making very large profits and taking advantage

of its important position in the manufacture and sale of paper to charge extremely high prices.

3. In carrying on its business, which required a large amount of money, the company was in the custom of financing itself through the flotation of a large amount of short-term negotiable notes. This commercial paper usually provided for payment in six months after date thereof and was disposed of through the agency of George H. Burr & Co., which dealt in negotiable short-time notes of commercial concerns of large business. The sale or negotiation of negotiable paper of this character depended upon the underlying quick assets of the concern whose paper was offered to banks and other financial houses. Subsequent to the stock dividend of June 12, 1916, and prior to March 15, 1917, conferences were had between the representatives of the company and representatives of George H. Burr & Co. regarding the flotation of additional commercial paper by the company. It was suggested that the surplus then carried by the company be put beyond the possibility of distribution through cash dividends by carrying it into capital, and such suggestion was insisted on by the representatives of Burr & Co. and was made a condition precedent to the flotation of the proposed additional notes of the company by Burr & Co. On February 28, 1917, the balance sheet of the company showed the following assets and liabilities:

Assets:

| | |
|---|---:|
| Cash | $119, 712. 18 |
| Book accounts | 2, 049, 204. 00 |
| Investments | 362, 237. 32 |
| Inventories | 2, 412, 896. 31 |
| Fixed assets | 804, 378. 99 |
| Total assets | 5, 748, 428. 80 |

Liabilities:

| | |
|---|---:|
| Notes payable | 791, 000. 00 |
| Outside liabilities | 1, 003, 284. 00 |
| Capital | 2, 250, 000. 00 |
| Reserves | 725, 770. 76 |
| Surplus | 978, 374. 04 |
| Total liabilities | 5, 748, 428. 80 |

4. The conferences between the representatives of the company and Burr & Co. resulted in the discussion of the recommendations of Burr & Co. among the officers and employees and at directors' meetings of the company. Because the stock dividend of 1916 had resulted in much adverse criticism among those engaged in the paper trade and in financial circles, the officers and directors were reluctant to openly declare a stock dividend in the amount of $750,000

within twelve months thereafter. The large stockholders, including the taxpayers, also objected to such a procedure, as they believed it would subject them to heavy income taxes, stock dividends being regarded as income at that time. However, they were willing to convert surplus into capital, as suggested, if these objections could be overcome. The result of conferences among the officers, directors, and leading stockholders of the company, who held a total of 20,104 shares of the outstanding 22,500 shares, was the adoption of a plan whereby the capitalization of $750,000 of surplus would be accomplished by calling for subscriptions for the 7,500 shares of stock remaining in the treasury of the company on the basis of one share for each three shares held by the stockholders, and the offsetting of the same by declaring a cash dividend in the total of $25 per share on the total 30,000 shares of the company payable in two installments, one in 1917 and one in 1918. This plan was evolved to avoid the appearance of a stock dividend and, at the same time, distribute the income tax to the stockholders over a two-year period. The scheme was adopted before the decision of the United States Supreme Court in the cases of *Towne* v. *Eisner*, 245 U. S. 418, decided January 7, 1918, and *Eisner* v. *Macomber*, 252 U. S. 189, decided March 8, 1920, when it was believed by the officers, directors, and stockholders of the company that stock dividends were taxable on the same basis as cash dividends. At the time the plan was evolved, approximately 92 per cent of the stock of the company was held by members of the Zellerbach family, or by officers, directors, or employees of the company, who were in accord with the plan. The remaining 8 per cent of the stock was held by "outsiders" and the plan was not discussed with or communicated to them, because the majority and "close in" stockholders desired to keep the nature of the plan secret, for the purpose of avoiding publicity.

5. On March 15, 1917, the board of directors of the company, at a special meeting thereof, passed a resolution reciting that there were 7,500 shares of unissued stock which it appeared to be to the company's interest to issue, provided that "the present stockholders" desired to subscribe for the full amount at par. The resolution authorized the sending of a circular letter to the stockholders inquiring if they desired to subscribe for the unissued stock at par in proportion to their respective holdings; it also authorized application to the Commissioner of Corporations for permission to sell the remaining unissued stock at par, and empowered the officers of the company to issue said stock according to subscriptions received. On March 16, 1917, a notice was sent to the minority stockholders and to some of the majority stockholders, but not to Theresa or Isadore Zeller-

bach, announcing that the directors had decided to ask permission from the Commissioner of Corporations to sell the remaining 7,500 shares of treasury stock "to the present stockholders in proportion to their holdings at the par value of $100 per share." The notice stated that before asking such permission it was desired to ascertain the wishes of the stockholders, and those desiring to subscribe were asked to fill out the inclosed subscription blank and return it before March 26. The enclosed subscription blanks provided for a stockholder's subscription and his agreement to pay for the same at $100 per share as soon as the stock was issued.

6. On March 29, 1917, the company filed its application with the Commissioner of Corporations of the State of California for permission to sell 7,500 shares of its capital stock at the price of $100 per share. Permit was issued on April 2, 1917, and on April 7th the company sent out a notice addressed to its stockholders advising them that permission had been granted for the issuance of the remaining unissued stock. This notice announced that all of the stockholders had subscribed for their pro rata; that the issue would be confined to one-third of their present holdings, eliminating fractions, and that a certificate for their pro rata of shares was ready for delivery. On March 15 there were 51 stockholders who held an aggregate of 22,500 shares in the company, and of these the holders of only approximately 8 per cent of the outstanding stock paid in $65,500 for their pro rata of the shares. None of the stockholders paid in any money and it was definitely understood by the holders of approximately 92 per cent of the stock that they would not be called upon for a stock subscription and that no money was to be paid by them. This understanding or agreement was never changed or modified.

7. Neither Theresa Zellerbach, who was the largest stockholder, owning 7,504 shares, nor Isadore Zellerbach, who was president and the next largest stockholder, owing 5,475 shares, these joint holdings being more than 57 per cent of the stock, made any subscription for the stock. Neither of them paid any money for the pro rata of stock to which they were entitled, but on April 7 certificates for 2,501 and 1,825 shares were issued, respectively, to Theresa and Isadore Zellerbach. Neither of them was charged on their personal accounts on the books of the company with the amounts which they should have paid for the shares issued had they been *bona fide* subscribers. No check in payment of the $25 per share dividend, the particulars of which are set out below, was delivered to either of them, and the evidence shows that neither of them was able to pay for her or his pro rata of the stock to be issued. These conditions existed as to the other majority stockholders, who were members of the Zellerbach family or officers or employees of the company

and who, with the taxpayers, owned approximately 92 per cent of the capital stock of the company. Under date of April 7, 1917, certificates for shares of stock were issued to each member of this group to the amount of his or her pro rata share and without regard to the fact that no subscription had been received from any such member.

8. On April 30, 1917, after the stock issue of April 7, 1917, the balance sheet of the company showed as follows:

Assets:

| | |
|---|---:|
| Cash | $31, 710. 59 |
| Book accounts | 2, 065, 848. 59 |
| Investments | 432, 129. 24 |
| Inventories | 2, 834, 720. 32 |
| Fixed assets | 1, 472, 345. 82 |
| Total assets | 6, 836, 754. 56 |

Liabilities:

| | |
|---|---:|
| Notes payable | 661, 000. 00 |
| Outside liabilities | 1, 131, 510. 74 |
| Capital | 3, 000, 000. 00 |
| Reserves | 890, 164. 80 |
| Surplus | 1, 154, 079. 02 |
| Total liabilities | 6, 836, 754. 56 |

Under date of April 9, 1917, the "Capital stock" account on the books had been credited with $750,000 and an account known as "Stock subscription" was opened, in which account the name of each stockholder was listed and he was charged with the par value of the stock issued to him on April 7. As payments were made by the 8 per cent minority, they were credited with such payments on this account. On June 30, 1917, the 92 per cent majority who paid no cash were credited with one-half the amount charged against their names on this account and on January 28, 1918, a similar credit was made, wiping out this account. To the stockholders who had paid in the sum of $65,500, or the persons to whom their stock had been transferred, $32,750 was paid on June 30, 1917, and a similar amount on January 28, 1918. On each of these same dates, June 30, 1917, and January 28, 1918, surplus was charged with $375,000, representing the amounts so credited and paid. The balance sheet of the company as of April 30, 1917, showed such increased stock as outstanding, without any corresponding decrease in surplus, and necessarily reflected the balance of the "Stock subscription" account among its assets until such account was wiped out by the charges against surplus as set out above.

9. On April 26, 1917, 19 days after the 7,500 shares of stock were issued, a meeting of the board of directors of the company was

held, at which the secretary reported that, in response to the circular sent to the stockholders in reference to stock subscriptions, many of the stockholders had replied expressing their inability to finance their pro rata at that time.   This report was made in face of the fact, known to all the directors, that it was intended to apply to the "inside stockholders" who owned approximately 92 per cent of the stock and on whom no demand for payment had been made.   Following this report, a resolution was introduced and adopted which recited that many of the stockholders were unable to pay for their pro rata of the stock and resolved: (1) That a special dividend be declared out of the surplus accumulated prior to January 1, 1917, of $25 per share, of which $12.50 per share would be payable June 5, 1917, and the other $12.50 during the year 1918; (2) that the company carry such stockholders as could not pay for their stock until it was fully paid for; and (3) that the stockholders thus carried be required to deposit their stock with the corporation.   This dividend of $25 per share was on all the stock held, which included the *issue of April 7th*, and meant that the $100 per share to cover the alleged disguised stock dividend was thus provided for.   Both Theresa and Isadore Zellerbach had had issued their certificates of stock before this meeting and each of them made transfers of some of the shares thus received to other persons during May, although neither had paid any money to the company or surrendered the stock for deposit with the company.   The majority stockholders all understood that there would be no money distributed to them or taken out of the business and that they would receive only a dividend in stock—one share for each three then held by them.

10. No money was ever paid to any of the stockholders by the company as a result of the resolution declaring the dividend of $25 per share, excepting to the shareholders comprising the 8 per cent minority who had paid in the sum of $65,500.   However, regular quarterly dividends of $2 per share were paid on all stock held of record on May 2, 1917, August 8, 1917, November 8, 1917, and February 28, 1918, including the 7,500 shares issued April 7, 1917.

11. The Commissioner ruled that the dividends voted on April 7, 1917, were cash dividends and were therefore taxable.

#### DECISION.

The deficiencies determined by the Commissioner are disallowed.

#### OPINION.

GRAUPNER: The question for our decision is this: Did the taxpayers receive income from the transactions set forth in the findings and therefore become liable for a tax thereon?   We are confronted

with a disguised dividend, and, in order to solve the question before us, must seek the true intent through the maze of inconsistencies existing between the minutes, the books of account, and the actions of the officers and directors of the company.

If we were to rely upon the records of the company as contained in the minute books alone we would of necessity be compelled to sustain the Commissioner. However, the situation in this appeal is like unto the conditions existing before the courts in *Eisner* v. *Macomber*, 252 U. S. 189, and, as in that case, we must have regard for the very truth of the matter and look to substance rather than form to reach a conclusion as to the merits of the taxpayers' contentions. If the dividend was, as a mater of actuality, a stock dividend, it can not be taxed as income, as the Commissioner in these cases seeks to do. *Towne* v. *Eisner*, 245 U. S. 418; *Eisner* v. *Macomber*, 252 U. S. 189.

What are the actual facts of the entire transaction within the corporation under which the Commissioner seeks to tax the two taxpayers involved herein? After the company declared its stock dividend in 1916 it still had a large surplus, which increased from month to month. Its financial agents desired that some of this surplus should be capitalized in order to facilitate the disposal of the company's short-term notes, through the sale of which it borrowed money for the business. These agents advised the declaration of another stock dividend of $750,000 in order to accomplish this purpose. The officers and guiding employees of the company did not want the publicity which the former stock dividend had occasioned and which they believed detrimental to the company's interests, nor did the stockholders wish to pay large income taxes on a dividend payable in one year. A plan was devised for a dividend which, outwardly, would appear as two special cash dividends, payable in two different years, but which was thoroughly understood by the holders of 92 per cent of the stockholders to be only a stock dividend. These stockholders knew that they would pay no money for the stock and would receive no money from the dividend, but that they would receive their pro rata of the 7,500 shares of stock, while the $750,000 would be transferred from " Surplus account " to " Capital stock account," on the books of the company. The actions of the officers and directors, as expressed in the minutes and notices sent to the stockholders, are inconsistent with actual happenings, but are consistent with the plan to give the stock dividend the appearance of being something else.

Approximately 8 per cent of the stockholders (those not within the controlling force of corporation) paid in cash for their pro rata of the 7,500 shares. They were nominally paid two dividends of

$12.50 each on all of the stock owned by them, but, as a matter of fact, they were repaid the money which they had paid in and thus had their stock for nothing. The holders of approximately 92 per cent of the shares (the operating majority) paid nothing and received nothing but their pro rata of the 7,500 shares of stock. The sum of $750,000 was transferred from surplus to capital stock, with a corresponding issue of stock certificates, and the plan of the controlling factors of the company was accomplished. Nothing was given to the stockholders which they had not theretofore had. The company still had the $750,000 and the stockholders merely had an increase in the number of pieces of paper, which represented the same proportionate interest in the property of the corporation that their original holdings did.

The fact that the officers of the company sought to delude the public or to distribute over two taxable years what they feared would be taxed in one year can not influence us in deciding these appeals upon their merits. We must take the actual results and, in their light, interpret the liability of each of the taxpayers. The situation existing in these appeals is well described in the language of Mr. Justice Pitney in the prevailing opinion of *Eisner* v. *Macomber*, 252 U. S. 189, where he says:

> The essential and controlling fact is that the stockholder has received nothing out of the company's assets for his separate use and benefit; on the contrary, every dollar of his original investment, together with whatever accretions and accumulations have resulted from employment of his money and that of the other stockholders in the business of the company, still remains the property of the company, and subject to business risks which may result in wiping out the entire investment. Having regard to the very truth of the matter, to substance and not to form, he has received nothing that answers the definition of income within the meaning of the Sixteenth Amendment.

See also. *Towne* v. *Eisner*, *supra*.

The foregoing language applies to the facts in these appeals and is determinative of the issues involved.

SMITH not participating.